LILI V. GRAHAM (SBN 284264)
lgraham@legal-aid.com
SARAH J. GREGORY (SBN 303973)
sgregory@legal-aid.com
MICHELLE KIM KOTVAL (SBN 293830)
mkotval@legal-aid.com
CRYSTAL SIMS (SBN 62796)
csims@legal-aid.com
LEGAL AID SOCIETY OF ORANGE COUNTY
2101 North Tustin Avenue
Santa Ana, California 92705
Telephone: 714.571.5282
Facsimile: 714.571.5270

ATTORNEYS FOR PLAINTIFFS

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

| | |
|---|---|
| PEOPLE'S HOMELESS TASK FORCE, an unincorporated association; CUPIE NEGRON; PAUL VELEZ; KIMBERLY MACHIELSON, as individuals;<br><br>Plaintiffs,<br><br>vs.<br><br>THE CITY OF ANAHEIM, a municipal entity,<br><br>Defendant. | No.<br><br>CIVIL RIGHTS COMPLAINT:<br><br>42 U.S.C. § 1983; FOURTH, FOURTEENTH, AND EIGHTH AMENDMENTS; CALIFORNIA CONSTITUTION ARTICLE I §§ 7, 13; TITLE II OF AMERICAN WITH DISABILITIES ACT, 42 U.S.C. § 12101 *et seq.*; § 504 OF THE REHABILITATION ACT; CAL. CIV. CODE §§ 52.1, 2080 *et seq.*; CONVERSION.<br><br>**JURY TRIAL DEMANDED** |

1

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, 42 U.S.C. § 12132 and 42 U.S.C. § 1983 because Plaintiffs' claims arise under the laws and Constitution of the United States.  Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the state law and state constitutional claims because Plaintiffs' state claims are related to Plaintiffs' federal claims, arise out of a common nucleus of operative facts, and form part of the same case or controversy under Article III of the U.S. Constitution.

2.      Venue is proper in the Central District of California because Defendant resides in the District and all events giving rise to Plaintiffs' claims occurred in the District. The relief Plaintiffs seek is within this Court's power to grant.

## INTRODUCTION

3.      The City of Anaheim ("Anaheim" or "Defendant") has evaded its fair share of responsibility to homeless residents in Orange County by failing to accommodate its unsheltered homeless population while simultaneously increasing unconstitutional means of law enforcement, including the seizure and destruction of property, intended to push the homeless out of Anaheim.  Anaheim has repeatedly seized and destroyed Plaintiffs' and other homeless residents' personal property without a warrant, without notice or opportunity to be heard, without providing adequate storage, and without

providing adequate opportunity to reclaim the property, causing substantial harm to homeless individuals, including Plaintiffs, who rely on their meager belongings to survive. Plaintiffs bring this lawsuit to challenge Anaheim's policy, custom, and practice of unlawfully seizing homeless residents' property.

4.       Plaintiffs are homeless individuals with mental and physical health disabilities who have been forced to live on the streets of Anaheim because of their inability to access appropriate permanent housing. In order to survive on the streets, Plaintiffs depend in large part on their personal property, including essential living items like medical devices, the tents they use as shelter, and the blankets and clothes that keep them warm at night.

5.       The lack of shelter and affordable housing in Anaheim means that homeless individuals such as Plaintiffs are forced to live on the streets in tents or makeshift shelters. The seizure of personal property is harmful to the life and health of individuals experiencing homelessness because it removes these individuals' only means of survival. Individuals with disabilities are particularly susceptible to such harm, and the loss of property can have disastrous consequences for their health and stability.

6.       Over the past year and a half, Anaheim police officers have repeatedly seized the personal property of Plaintiffs and other homeless residents without warning, often in conjunction with the arrest of Plaintiffs for non-violent quality-of-life infractions.

Often, Defendant destroys the property immediately, particularly life-saving property such as tents and blankets. What property is not destroyed may be taken to a storage facility miles away, where it is not inventoried or recoverable.

7.    Under well-settled Ninth Circuit law, Defendant's actions are unconstitutional. In *Lavan v. City of Los Angeles*, the Ninth Circuit upheld a preliminary injunction enjoining the City of Los Angeles from seizing the property of unhoused individuals without complying with the requirements of the Fourth and Fourteenth Amendments to the U.S. Constitution—even if that property is temporarily unattended. *Lavan v. City of Los Angeles*, 693 F.3d. 1022 (9th Cir. 2012), 133 S.Ct.2855 (2013) *cert denied*. The *Lavan* court stressed that "the government may not take property like a thief in the night; rather, it must announce its intentions and give the property owner a chance to argue against the taking." *Id.* at 1032. The Court explained that this "rule holds whether the property in question is an Escalade or a [tent], a Cadillac or a cart." *Id.* at 1032.

8.    Similarly, in *Schuler v. County of Orange*, the District Court for the Central District of California issued a temporary restraining order enjoining the summary seizure and destruction of homeless residents' property and requiring the County of Orange to provide notice and accessible storage of that property consistent with the U.S. Constitution. *Schuler v. County of Orange*, Case No. 8:17-cv-00259-DOC-KES, Dkt. #21 (C.D. Cal. Feb. 24, 2017).

9.      Despite being aware of the established law in this Circuit, Anaheim has continued to treat homelessness as a crime and has continued to disregard the constitutional rights of homeless individuals by summarily seizing and destroying their property and enacting policies that push homeless individuals out of its jurisdiction.

10.      Anaheim's process for storing what little property it does not destroy is so inadequate as to render the storage almost non-existent.  The primary storage facility is open just a few hours each Tuesday afternoon, such that Plaintiffs and others have been forced to go up to a full week before being able to retrieve their property.  Further, the facility is located miles away from the site of the seizures, making it inaccessible to homeless residents who do not have a car.  These residents must rely on public transportation to get to the facility, but often cannot use public transportation for the return trip because the amount of property they can take on the bus is limited.  For individuals with cognitive, physical, medical and psychological challenges, this task is all the more daunting.

11.      The consequence of Anaheim's actions is that Plaintiffs and others who are similarly situated are forced to survive on the streets fully exposed to the elements without the protection that their blankets, tents and other critical property provided.  Anaheim's actions have put these individuals' health and safety in immediate danger and have caused long-term damage to their well-being by undermining their efforts to achieve health and housing stability.  Anaheim at all relevant times knew full well

about these consequences, yet it nonetheless adhered to its improper practices, causing

ongoing injury to Plaintiffs and other homeless residents who are similarly situated.

## PARTIES

**A.    PLAINTIFFS**

12.    Plaintiff PEOPLE'S HOMELESS TASK FORCE ("PHTF") is a grassroots

association formed to assist and advocate on behalf of homeless residents of Anaheim

and Orange County.  PHTF's mission is to advocate for a Housing First model in

Anaheim and Orange County as a solution to ending homelessness.  PHTF members

advocate at Anaheim City Council meetings and County Board of Supervisors

meetings to urge local officials to use public monies to fund homeless services

programs, including permanent supportive housing.

13.    As a result of Anaheim's repeated seizures of homeless residents' property,

PHTF has been required to divert resources away from its mission in order to provide

assistance to Anaheim's homeless residents.  PHTF has shifted resources to: (1)

addressing the City Council to request that the Anaheim Police Department stop

seizing homeless residents' property and repeal discriminatory camping and property

storage ordinances used in conjunction with property seizures; (2) raising public

awareness about the plight of the homeless in Anaheim and the negative impacts of

property seizures; (3) responding to calls from homeless Anaheim residents who have

had their property seized; (4) coordinating food, clothing and donation drives to assist

homeless residents and replace property seized; (5) monitoring the activity of Anaheim police and other city personnel to document Anaheim's treatment of homeless residents; and (6) working to protect the health of homeless residents, many of whom have disabilities, when Anaheim seizes their property. Due to this drain on its resources, PHTF has been unable to fully engage in advocacy and solutions relating to its mission of promoting the Housing First model in Anaheim.

14.    Plaintiff CUPIE NEGRON ("NEGRON") is 47 years old and has been homeless for approximately four years. NEGRON first moved to Orange County in approximately 1990. NEGRON suffers from various health problems, which cause acute pain and require her to undergo regular blood transfusions. She is disabled as defined by the ADA[1] and meets the definition of "chronically homeless" as defined by the U.S. Department of Housing and Urban Development ("HUD").[2] NEGRON has

---

[1] "Disability" means "(A) a physical or mental impairment that substantially limits one or more major life activities; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12101(1). "[M]ajor life activities include but are not limited to caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *Id.* § 12101(2)(A). Major life activity also includes the operation of a major bodily function including the immune system, digestive, neurological, brain, respiratory, and reproductive functions. *Id.* § 12101(2)(B).

[2] HUD regulations define "chronically homeless" to mean an individual with a disability who lives in a place not meant for human habitation, and has been homeless continuously for at least 12 months or on at least four separate occasions in the last three years. 24 C.F.R. § 91.5(1). A "homeless individual" is one who lacks a fixed, regular, and adequate nighttime residence. 42 U.S.C. § 11302(a)(1).

been unable to hold the steady full-time employment necessary to afford market-rate rents in Orange County.

15.     Since becoming homeless, NEGRON has lived primarily in or around Maxwell Park in Anaheim, California, where she has a community that she relies on for support. On at least three separate occasions, Anaheim police officers have seized NEGRON's belongings without providing NEGRON with notice or an opportunity to be heard, and without providing her with adequate storage or an opportunity to retrieve her property.

16.     Plaintiff PAUL VELEZ ("VELEZ") is 44 years old and has been homeless for approximately four years.  VELEZ has lived in Orange County all his life.  He was raised in Anaheim Hills and attended Canyon High School.  Since losing his job in 2014, VELEZ has been unable to hold the steady full-time employment necessary to afford market-rate rents in Orange County.

17.     Since becoming homeless, VELEZ has lived primarily in or around Maxwell Park in Anaheim, California, where he has a community that he relies on for support. On at least three separate occasions, Anaheim police officers have seized VELEZ's belongings without notice or an opportunity to be heard, and without providing him with adequate storage or an opportunity to retrieve his property.

18.     Plaintiff KIMBERLY MACHIELSON ("MACHIELSON") is 47 years old and has been homeless for approximately ten years.  MACHIELSON is a survivor of domestic violence.  She first moved to Orange County when she was five years old.

8

She became homeless after her parents died and she fell into a deep depression. MACHIELSON has been unable to hold the steady full-time employment necessary to afford market-rate rents in Orange County.

19.     Since approximately January 2017, MACHIELSON has lived primarily in or around Maxwell Park in Anaheim, California, where she has a community that she relies on for support.  On at least four separate occasions, Anaheim police officers have seized MACHIELSON's belongings without notice or an opportunity to be heard, and without providing her with adequate storage or an opportunity to retrieve her property.

**B.     DEFENDANT**

20.     Defendant City of Anaheim is a municipal entity with the capacity to sue and be sued.  The departments of Defendant include the Anaheim Police Department. Employees and agents of Defendant have engaged in the acts and omissions complained of herein pursuant to the policies, practices and/or customs of Defendant.

21.     Defendant and its employees and agents participated in the unlawful conduct challenged herein and, to the extent that they did not participate, authorized, acquiesced, set in motion, or failed to take necessary steps to prevent the acts that resulted in the unlawful conduct and the harm suffered by Plaintiffs.  Each acted in concert with each other.  The challenged acts caused the violation of Plaintiffs' rights.

**ANAHEIM'S FAILURE TO PROVIDE SUFFICIENT SHELTERS AND AFFORDABLE HOUSING TO ADDRESS ITS FAIR SHARE OF HOMELESSNESS IN ORANGE COUNTY**

22.     Over the last several years, the number of unsheltered individuals in Orange County has steadily increased, due in part to the lack of emergency shelters and permanent affordable housing available in the local housing market, but also due to the failure of the County and its 34 cities, including Anaheim, to address the systemic causes of homelessness.

23.     Anaheim participates in the Orange County Continuum of Care ("COC"), a regional system designed to coordinate housing and supportive services for the County's homeless population.[3]

24.     Anaheim has also applied for and received federal Emergency Solutions Grant ("ESG") monies through the U.S. Department of Housing and Urban Development. Anaheim's ESG program is designed to "identify sheltered and unsheltered homeless persons, as well as those at risk of homelessness, and provide the services necessary to help those persons to quickly regain stability in permanent housing after experiencing a housing crisis and/or homelessness."[4]  Anaheim's ESG program focuses on "assisting people to regain stability in permanent housing."[5]

---

[3] City of Anaheim Consolidated Plan 2015-2019 at 9, *available at* https://www.anaheim.net/DocumentCenter/View/10727.

[4] *See* FY 2016-2017 ESG Subrecipient Funding Application (2016), *available at* http://www.anaheim.net/DocumentCenter/View/10651.

[5] *Id.*

25.    In 2017, at least 4,792 people were homeless in Orange County, according to the County Point-In-Time Count, an annual countywide census of people experiencing homelessness.  Of those, 54% went unsheltered on any given night.  According to a 2016 census conducted by Anaheim, 797 homeless Anaheim residents—constituting 88% of the 906 homeless people living in Anaheim—went unsheltered.[6]  Many of those individuals experience mental health disabilities, resulting in over 1,000 emergency mental health calls per year to Anaheim alone.[7]

26.    Despite its large unsheltered homeless population and the money it has received for homeless housing and services, Anaheim only has a fraction of the beds needed to accommodate its unsheltered homeless population.  Upon information and belief, Anaheim has 202 emergency shelters beds that service women with children, families with children, and veterans.[8]  In addition, Anaheim hosts the Bridges at Kraemer Place shelter with approximately 193 emergency shelter beds, but that shelter serves homeless individuals in the County, not just Anaheim residents, and requires County referrals.[9]  Anaheim has the potential to develop more emergency shelters to meet its

---

[6] Anaheim Homeless Census at 1 (Nov. 2016), *available at* http://anaheim.net/DocumentCenter/View/14920.

[7] *Id.* at 2.

[8] City of Anaheim, Housing Element 2014-2021 at 3-27, *available at* https://www.anaheim.net/DocumentCenter/Home/View/1867.

[9] County of Orange, Board of Supervisors, Special Meeting held on April 17, 2018, Discussion Items 1 Building the System of Care at 41, *available at* http://cams.ocgov.com/Web_Publisher_Special/agenda04_17_2018.pdf.

regional fair-share responsibility.  Indeed, Anaheim has designated 1,218 available parcels, totaling 1,615 acres of land, for its "emergency shelter opportunity areas."[10]

27.    In addition, Anaheim has a substantial affordable housing need but lacks the affordable housing units necessary to meet its "fair-share" of the regional housing allocation, particularly as it relates to extremely-low income households.  Under state housing element law, Anaheim is required to adopt a general plan that governs its future land uses, which includes a housing element that makes adequate provisions for the existing and projected housing needs of all economic segments of the community.[11] These requirements are intended to "assure that counties and cities recognize their responsibilities in contributing to the attainment of the state housing goal" so that each jurisdiction does its part to address the regional housing need.[12]  Extremely low-income households are households that earn less than 30 percent of the County's median family income and include homeless households.

28.    The projected extremely-low-income household need for Anaheim's fair share allocation is 628 units, as determined by the Southern California Association of Government, and this number has been allocated to "avoid an over-concentration of Lower-Income households in any one jurisdiction."[13]  Yet, as the city itself

---

[10] City of Anaheim, Housing Element 2014-2021 at 3-30.
[11] Gov't. Code §§ 65300, 65302(c), 65583, 65580(d).
[12] *Id.* at § 65581.
[13] City of Anaheim, Housing Element 2014-2021 at 2-25, *available at* https://www.anaheim.net/DocumentCenter/Home/View/1867.

acknowledges in its Consolidated Plan, Anaheim has not taken the steps necessary to meet the number of affordable housing units needed.[14]  Thus, although Anaheim recognizes the desperate need for affordable housing and emergency shelters, it has failed to relieve the suffering of its homeless and low-income residents, instead choosing to pursue a policy, custom and practice of criminalizing these vulnerable residents.

### ANAHEIM'S CRIMINALIZATION OF HOMELESS RESIDENTS THROUGH ARRESTS AND PROPERTY SEIZURES

29.     According to a study by the American Civil Liberties Union, 33 of the 34 cities in the County—including the City of Anaheim—criminalize homelessness by seizing homeless residents' property and citing or arresting them for activities that are the unavoidable consequences of being homeless, including sitting, sleeping, or storing property.[15]  These practices forced many people to move to the Santa Ana Riverbed ("Riverbed"), which historically was not patrolled by local police.

30.     Upon information and belief, many local police departments, including the Anaheim police, told homeless individuals that they should leave Anaheim or move to the Riverbed in order to avoid being cited or arrested.

---

[14] City of Anaheim Consolidated Plan 2015-2019 at 54, *available at* https://www.anaheim.net/DocumentCenter/View/10727.

13

31.     Political pressure to remove the homeless encampments along the Riverbed began to dramatically increase toward the end of 2017.  In August 2017, over 11,000 people signed a petition calling on the County to remove the Riverbed residents.

32.     In response, in September 2017, Anaheim declared a "state of emergency" related to increasing rates of homelessness and passed "Operation Home Safe," a program ostensibly designed to address homelessness.  Although the resolution empowered staff to increase shelter and services, including identifying locations for at least 500 shelter beds or other housing options and expediting the completion of an additional 100 beds at the Bridges at Kraemer Place ("Kraemer") shelter, Anaheim also ordered an increase in law enforcement in homeless communities.  Anaheim immediately increased its law enforcement efforts against its homeless residents even though it continues to lack sufficient shelter to house the homeless population.

33.     On October 24, 2017, the Anaheim City Council considered scaling back the homeless services provided at La Palma Check-In Center in Anaheim.  Under the Anaheim Municipal Code § 11.10.040, it is illegal to store property in public.  The La Palma Check-In Center provides one of the only viable options for homeless individuals to legally store their property.  Upon information and belief, Anaheim has decided not to continue operation of the storage facility after June 2018.  Without a place to store property, Anaheim's homeless population will be at risk of citation or

arrest for violation of the property storage ordinance, further exacerbating the conditions that cause homelessness.

34.    In January 2018, the County announced that it would be conducting a mass relocation of homeless individuals from the Riverbed.  Anaheim officials publicly stated that anti-camping and similar ordinances, commonly called "quality of life" ordinances, would be enforced against homeless people who moved from the Riverbed to Anaheim.[16]  Upon information and belief, Anaheim has 18 anti-homeless laws that restrict categorical activities such as standing, sitting and resting; sleeping, camping, and lodging; and begging and panhandling.

35.    On January 29, 2018, homeless individuals and the Orange County Catholic Worker sued the County of Orange and the cities of Anaheim, Costa Mesa, and Orange, alleging that defendants' citing and arresting of homeless individuals for unavoidable behavior such as sleeping violates the Eight Amendment and other state and federal laws.  *Orange County Catholic Worker, et al. v. County of Orange, et al.*, Case No. 8:18-cv-00155-DOC-KES.

36.    On February 7, 2018, homeless individuals and PHTF filed a lawsuit against the County, alleging that the County's homeless program discriminates against people with

---

[16] Jordan Graham, *Orange County is ready to clear out the Santa Ana riverbed homeless encampment. But where – and exactly when – will they go?*, Orange County Register (Jan. 21, 2018) *available at* https://www.ocregister.com/2018/01/21/orange-county-is-ready-to-clear-out-the-santa-ana-riverbed-homeless-encampment-but-where-and-exactly-when-will-they-go/.

disabilities under the ADA and violates homeless individuals' rights under state and federal law. *Ramirez, et al. v. County of Orange*, Case No. 8:18-cv-00220-DOC-KES.

37.    On April 10, 2018, Anaheim continued its policy, custom, and practice of enforcing against homeless individuals by approving the second reading of an ordinance that would restrict the parking of oversized vehicles, such as recreational vehicles, on city streets and that would subject vehicle owners to citation or vehicle impoundment.  The City Council passed the ordinance despite hearing from homeless residents, who explained that they rely on their recreational vehicles as housing of last resort, and that this ordinance would prohibit them from parking, working and living in Anaheim.

38.    On April 13, 2018, upon information and belief, Anaheim forced a motel that was participating in a County program for homeless individuals to evict residents suffering from severe, persistent mental illness, requiring their immediate relocation to a different motel outside city limits.

39.    During the hearings in the *Ramirez* and *Catholic Worker* cases, the District Court warned cities, including Anaheim, that criminalization of homeless individuals for unavoidable activity is unconstitutional and would not be tolerated.  Despite these clear warnings, Anaheim has continued to enforce against homeless communities and criminalize homelessness by citing and arresting homeless individuals and seizing their property.

## DEFENDANT HAS A POLICY, CUSTOM AND PRACTICE OF SEIZING AND DESTROYING HOMELESS RESIDENTS' PROPERTY

39. Since at least December 2016, Anaheim has had a policy, custom and practice of seizing and destroying the personal property of homeless individuals without adequate notice, opportunity to be heard, storage services, or reclamation process, often in conjunction with a citation or arrest for non-violent quality-of-life infractions.

40.    Even when Anaheim does not immediately destroy homeless residents' property, it makes that property virtually unavailable to its owner in a number of ways.  First, Anaheim does not provide the individual with any receipt, claim number, or other information about how to retrieve that property.  Thus, homeless individuals often spend days calling or visiting different police facilities inquiring about their property. In addition, Anaheim has failed to implement procedures for inventorying property.  As a result, property is lost, damaged, mixed in with others' property, or improperly labeled or stored.

41.    Anaheim also only permits individuals to retrieve the property once a week, on Tuesday afternoons.  Thus, if an individual's property is seized on Tuesday evening, they must go a full week without their essential belongings, often exposing them to nighttime temperatures without the protection of a tent or blanket.

42.    Anaheim has also made seized property extremely difficult to retrieve by moving it to a storage facility located miles away from the site of the seizures.  For example, the storage facility on East Vermont Avenue in Anaheim is approximately

five and a half miles away from Maxwell Park, where many homeless residents reside.

Homeless residents like Plaintiffs who do not have vehicles of their own must take two

buses to get to the storage facility. Even if they are able to get to the storage facility

during the short window of time it is open, it is often impossible to transport that

property back to where they live because they are not permitted to take oversized

baggage on public buses. Many homeless individuals, including Plaintiffs, do not own

a car and do not have the funds to rent a vehicle to transport the property that has been

taken from them.

**DEFENDANT HAS REPEATEDLY
SEIZED AND DESTROYED PLAINTIFFS' PROPERTY**

**A.     The December 21, 2016 Seizure of VELEZ's and NEGRON's Property**

43.     On or about December 21, 2016, during a heavy rainfall, NEGRON and VELEZ

were taking shelter with their personal property under a tarp on Lincoln Avenue in

Anaheim. In the midst of the storm, and without any notice, Anaheim police

approached NEGRON and VELEZ and arrested them for loitering. The police officers

also seized all of NEGRON's and VELEZ's belongings, but did not give NEGRON or

VELEZ any claim ticket or information about how to retrieve their property. The

police officers only provided them with a phone number to the Anaheim storage

facility on East Vermont Avenue.

44.     NEGRON and VELEZ were not given any notice that their property would be

seized on December 21, 2016, and they were not given an opportunity to be heard

18

during the seizure.  Further, because their property was seized on a Wednesday and the storage facility was only open on Tuesday afternoons, VELEZ and NEGRON had to wait six full days before they could attempt to retrieve their property.

45.    The Tuesday after their release from jail, NEGRON and VELEZ traveled to the storage facility to reclaim their property.  Although NEGRON and VELEZ provided an itemized description of the property that had been seized, the officer working at the storage facility stated that they did not have many of the items requested, including NEGRON's clothing, blankets, personal hygiene items, and cell phone.  VELEZ was unable to retrieve a 4-person tent, a 10-person tent, a Sony laptop computer, his cell phone, flashlights, four portable chargers, and an electric shaver.  Defendant could not provide any explanation for the missing property.

46.    As a result of Defendant's actions, Plaintiffs suffered substantial injury.  These items were critical to NEGRON's and VELEZ's ability to survive on the streets of Anaheim, particularly given that Defendant's seizure of the property occurred in the winter of 2016, when nighttime temperatures regularly dropped into the 40s and when Anaheim received above-normal rainfall.[17]

**B.    The February 1, 2017 Seizure of MACHIELSON's, VELEZ's and NEGRON's Property**

---

[17] U.S. Climate Data, Anaheim, California (last visited Apr. 9, 2018), *available at* https://www.usclimatedata.com/climate/anaheim/california/united-states/usca0027/2016/12.

19

47.     Just over a month later, at approximately 10:30 p.m. on or about February 1, 2017, approximately eight Anaheim police cars, a paddy wagon, and an Anaheim trash truck arrived at Maxwell Park where MACHIELSON, VELEZ, NEGRON and other homeless residents had gathered.  The police cars encircled the homeless individuals and began making arrests and seizing property.

48.     Anaheim police officers arrested MACHIELSON for allegedly loitering. Anaheim police officers then seized almost all of the property she owned, including items essential to her survival such as clothes, bedding, and personal hygiene products, as well as her coloring books and colored pencils, which she uses as a therapeutic tool to manage stress and anxiety.

49.     NEGRON was also arrested for loitering and all of her belongings were seized. She asked the police officers to let her keep her phone and purse containing her identification, EBT card, and other essential items, but the officers refused.

50.     Anaheim police officers also seized everything VELEZ owned.  The property Anaheim seized included VELEZ's wallet, which contained his identification, and his clothing, bedding, hygiene items, and electronics.  Anaheim also seized an unopened tablet computer, which VELEZ's sister had recently given to him as a Christmas gift.

51.     MACHIELSON, VELEZ, NEGRON and the other homeless residents were not given any notice that their property would be seized on February 1, 2017, and they

were not given any opportunity to be heard during the seizure.  Anaheim also did not provide any receipt or other information about how to retrieve their property.

52.    MACHIELSON, VELEZ, and NEGRON each individually attempted to retrieve their property.  However, because their property was seized on a Wednesday and the storage facility was only open on Tuesday afternoons, MACHIELSON, VELEZ, and NEGRON had to wait six full days before they could attempt to retrieve their property.

53.    MACHIELSON went to the storage facility on the following Tuesday.  However, Defendant only returned her coloring books and colored pencils.  Defendant told her that her bedding and clothing had been destroyed.

54.    NEGRON also went to the storage facility the following Tuesday, but her electronics were missing.  Defendant told NEGRON that her bedding and clothes had been destroyed.

55.    VELEZ also went to the storage facility the following Tuesday, but was told that they did not have his electronics, including his new tablet computer.  Defendant told VELEZ that his bedding and clothing had been destroyed.

56.    As a result of Defendant's actions, Plaintiffs suffered substantial injury.  The items seized were critical to Plaintiffs' health, safety, and ability to survive on the streets, particularly given that the seizures occurred in February 2017, in the midst of winter.

**C.    The March 10, 2017 Seizure of MACHIELSON's, VELEZ's and NEGRON's Property**

57.    Just over one month later, on or about March 9, 2017, at approximately 11:00 p.m., Anaheim police again surrounded the homeless residents at Maxwell Park, including MACHIELSON, VELEZ, and NEGRON, and began making arrests and seizing property.

58.    Once again, Anaheim police officers arrested MACHIELSON, VELEZ, and NEGRON and seized all of their belongings.

59.    MACHIELSON, VELEZ, and NEGRON were not given any notice that their property would be seized on March 9, 2017 or any opportunity to be heard regarding the seizure.  Defendant also did not provide them with any receipt or other information about how to retrieve their property and threw much of the property in the trash as a trash truck also arrived with the police officers.

60.    MACHIELSON, VELEZ, and NEGRON each individually attempted to retrieve their property.  However, because their property was seized on a Friday and the storage facility was only open on Tuesday afternoons, MACHIELSON, VELEZ, and NEGRON had to wait four days before they could attempt to retrieve their property.

61.    MACHIELSON went to the storage facility on the following Tuesday. However, MACHIELSON's lower dentures, clothing and bedding had already been lost or destroyed.

62.    NEGRON went to the storage facility on the following Tuesday.  Defendant did not return NEGRON's cell phone, EBT card, bicycle, heirloom jewelry, battery charger, and alarm clock.  Negron's property had been lost or destroyed.

63.    VELEZ also went to the storage facility on the following Tuesday.  However, several of VELEZ's belongings were missing.

64.    As a result of Defendant's actions, Plaintiffs suffered substantial injury.  The items seized were critical to Plaintiffs' health, safety, and ability to survive on the streets.

**D.    The November 19, 2017 Seizure of MACHIELSON's Property**

65.    On November 19, 2017, at approximately 9:30 a.m., several Anaheim police officers approached MACHIELSON in Maxwell Park.  Without warning, police officers and city employees took all of MACHIELSON's property, threw it in the back of a pickup truck, and drove away.  MACHIELSON was not given any warning that her property would be seized, any opportunity to be heard, or any receipt or adequate information about how to retrieve her property.

66.    MACHIELSON was told that her property was being held at the East Vermont storage facility under someone else's name.  Although MACHIELSON attempted to claim her property based on the information given by Defendant, Defendant failed to return some of MACHIELSON's most essential belongings, including her sleeping bag

and a white canvas bag containing her cellphone, identification card, bus pass, gift card, and her upper dentures.

67.    As a result of Defendant's actions, MACHIELSON suffered substantial injury. The items seized were critical to Plaintiffs' health, safety, and ability to survive on the streets.

**E.    The February 25, 2018 Seizure of MACHIELSON's Property**

68.    On or about February 25, 2018, Anaheim police officers arrested MACHIELSON and seized her wallet, which contained her identification and EBT card.  Although MACHIELSON repeatedly requested that Defendant return her wallet, Defendant told MACHIELSON that her wallet had been lost during her arrest.

**DEFENDANT'S POLICY, CUSTOM AND PRACTICE
OF SEIZING AND DESTROYING HOMELESS RESIDENTS' PROPERTY
CAUSES IRREPARABLE HARM TO THEIR HEALTH AND STABILITY**

69.    Defendant's policy, custom and practice poses an immediate danger to the health and safety of Plaintiffs and others like them.  According to a census conducted by Defendant, 88% of the homeless population in Anaheim have no shelter and are forced to live outside.  Many of these individuals also have or are at serious risk for serious mental or physical disabilities.  The risk is greatly increased by several factors, including preexisting health conditions and a lack of shelter, especially in the winter months when it is cold and it rains.

70.    The danger created for unhoused individuals by the systematic seizure and destruction of their property, including the most basic necessities, including blankets,

tents and tarps, is obvious and particularly so at night or during the winter months. Nighttime temperatures in Orange County regularly drop to 50 and below, exposing homeless individuals who have had their tents and blankets seized to hypothermia and other illnesses that can result from sleeping unsheltered on the streets, particularly in the rain. As an example, Defendant seized VELEZ's and NEGRON's property during a rain storm in December 2016—a month in which rainfall with more than three times normal—leaving them without protection from the elements.[18] When Defendant seized Plaintiffs' tents and blankets in February 2017, the temperature regularly dropped to the mid-40s, without taking into account the wind-chill factor.[19]

71.    Defendant's policy, custom and practice of seizing homeless residents' property also causes long-term harm to those residents' health and stability, including their ability to obtain stable housing. Defendant's policy, custom and practice of arresting or citing homeless residents and seizing their property robs those residents of the possessions they use to survive, requiring them to spend what little resources they have replacing those items, and creates debts that they do not have the resources to pay. As a result, Defendant's policy, custom and practice perpetuate the cycle of homelessness and the deterioration of homeless residents' health.

---

[18] U.S. Climate Data, Anaheim, California (last visited Apr. 13, 2018), *available at* https://www.usclimatedata.com/climate/anaheim/california/united-states/usca0027/2016/12.

[19] U.S. Climate Data, Anaheim, California (last visited Apr. 9, 2018), *available at* https://www.usclimatedata.com/climate/anaheim/california/united-states/usca0027/2017/2.

72.     As a result of Defendant's actions, Plaintiffs were forced to live outside without the protection of a tent or blankets.  Due to Defendant's seizure of Plaintiffs' cell phones, Plaintiffs were unable to make appointments or contact public agencies to access services.  Defendant also destroyed critical items that Plaintiffs rely on to survive outside, such as tents, tarps, blankets, clothing, identification, bus passes and EBT cards.  Plaintiffs have suffered emotional distress caused by the hardship of living on the streets without these essential survival items.  Defendant's seizure and destruction of Plaintiff MACHIELSON's upper and lower dentures has caused her emotional distress, including embarrassment and humiliation, and prevented her from eating solid foods, including over the 2017 Thanksgiving holiday.

73.     The immediate and substantial risk to the health and safety of the homeless community far outweighs any perceived public health hazard that Defendant may use to justify the seizure and destruction of property, such as the uncleanliness of the personal property or the fact that personal possessions became wet as a result of the rain.

**DEFENDANT DENIED OR IGNORED
PLAINTIFFS' CLAIMS FOR PROPERTY DAMAGE**

74.     On September 1, 2017, Plaintiffs NEGRON and VELEZ submitted claims to the Defendant for damages resulting from the unlawful seizure and destruction of her property, pursuant to the California Torts Claims Act.

75.     On December 8, 2017, Plaintiff MACHIELSON submitted a claim to the Defendant for damages resulting from the unlawful seizure and destruction of her property, pursuant to the California Torts Claims Act.

76.     On October 19, 2017, Defendant denied Plaintiffs NEGRON's and VELEZ's claims.  To date, Defendant has failed to respond to Plaintiff MACHIELSON's claims.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Right to Be Secure From Unreasonable Seizures
### 42 U.S.C. § 1983 – Fourth Amendment; Art. 1, § 13, California Constitution

77.     Plaintiffs hereby incorporate all preceding paragraphs as if fully set forth herein.

78.     The Fourth Amendment protects individuals with a possessory interest in their property from seizure of, or meaningful interference with, that property.   Defendant and its employees and agents violated Plaintiffs' Fourth Amendment rights to be free from unreasonable seizure of their property by confiscating and then destroying Plaintiffs' property, and further by depriving Plaintiffs of reasonable access to any property that was not destroyed.  Defendant and its agents and employees engaged in these acts without obtaining a warrant, without giving Plaintiffs adequate notice, and without providing Plaintiffs with a meaningful opportunity to be heard.

79.     When Plaintiffs' property was confiscated by Defendant, Defendant did not attempt to segregate and preserve essential survival items such as Plaintiffs' tents, blankets, identification, EBT cards, and dentures.

80.    Defendant did not provide Plaintiffs with receipts identifying the seized property or with information as to the location that property was taken.  Nor did Defendant provide a reasonable means by which Plaintiffs could retrieve the seized property, such as a reasonable means of transportation to retrieve Plaintiffs' property from where they lived.

81.    Plaintiffs are informed and believe that the acts of the Defendant and its employees and agents were part of a city-wide policy, practice, and/or custom of seizing and destroying the personal property of Anaheim's homeless residents without obtaining a warrant, without giving adequate notice and a meaningful opportunity to be heard, and without a reasonable procedure for inventorying and reclaiming property.

82.    Plaintiffs are informed and believe that the acts of the Defendant and their employees and agents were intentional in failing to protect and preserve Plaintiffs' property and that, at minimum, Defendants were deliberately indifferent to the illegality of the seizure.

83.    Defendant knew or should have known that the property seized was critical to Plaintiffs' welfare.  These unlawful actions were done with the specific intent to deprive Plaintiffs of their constitutional rights to be secure in their property and to drive Plaintiffs and others who are similarly situated out of Anaheim.

84.    As a direct and proximate consequence of these unlawful acts, Plaintiffs have suffered and continue to suffer loss of their personal property and physical and

emotional distress and are entitled to injunctive relief and compensatory damages for that loss and for injuries to their person.

## SECOND CAUSE OF ACTION
### Right to Due Process of Law
### 42 U.S.C. § 1983 – Fourteenth Amendment; Art. 1 § 7, California Constitution

85.    Plaintiffs hereby incorporate all preceding paragraphs as if fully set forth herein.

86.    Defendant and its employees and agents owed Plaintiffs a duty under the due process clause of the Fourteenth Amendment to the U.S. Constitution and Article I, Sec. 7 of the California Constitution to protect the personal property of the Plaintiffs. This duty applied to preserving the personal property of individuals arrested and taken into custody.

87.    Despite this well-defined duty, Defendant did not provide Plaintiffs with adequate notice that their property was at risk of being seized and/or destroyed and did not provide Plaintiffs with a meaningful opportunity to be heard regarding such seizure and destruction of their property, even though Plaintiffs' right to such notice and opportunity to be heard was well-established at the time.  Further, Defendant failed to preserve the property or provide adequate manner and means to reclaim it in a timely manner.

88.    Defendant seized and destroyed the personal property of the Plaintiffs without due process, lawful justification, or just compensation.

89.    Defendant knew or should have known that the property was not abandoned and was not garbage.

90.    Plaintiffs are informed and believe that the acts of the Defendant and its employees and agents were part of a city-wide policy, practice, and/or custom of seizing and destroying the personal property of Anaheim's homeless residents without obtaining a warrant, without giving adequate notice and a meaningful opportunity to be heard, and without a reasonable procedure for inventorying and reclaiming property.

91.    Plaintiffs are informed and believe that the acts of the Defendant and their employees and agents were intentional in failing to protect and preserve Plaintiffs' property and that, at minimum, Defendant was deliberately indifferent to Plaintiffs' due process rights.

92.    As a direct and proximate consequence of these unlawful acts, Plaintiffs have suffered and continue to suffer loss of their personal property and physical and emotional distress and are entitled to injunctive relief and compensatory damages for that loss and for injuries to their person.

**THIRD CAUSE OF ACTION**
**Violation of 42 U.S.C. § 12101 et seq.**
**Title II of the Americans with Disabilities Act**

93.    Plaintiffs hereby incorporate all preceding paragraphs as if fully set forth herein.

94.    Title II of the Americans with Disabilities Act ("ADA") provides that "no qualified Individual with a disability shall, by reason of such disability, be . . . denied

the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

95.    At all times relevant to this action, Defendant was a public entity within the meaning of Title II of the ADA and provided programs, services, or activities to the general public.

96.    At all times relevant to this action, Plaintiffs were qualified individuals with one or more disabilities within the meaning of Title II of the ADA and met the essential eligibility requirements under Title II.

97.    Defendant's policy, practice, or custom of seizing and destroying essential items utilized by Anaheim's disabled homeless residents constitutes a method of administration that discriminates against Plaintiffs on the basis of their disabilities.  28 C.F.R. § 35.130(b)(3).

98.    Defendant's actions subjected Plaintiffs to discrimination on the basis of their disabilities in violation of Title II of the ADA by destroying their property and unreasonably preventing Plaintiffs from accessing items necessary to maintain their health and safety.

99.    Plaintiffs' disabilities as well as their need for reasonable modifications of Defendant's policies were obvious and readily apparent to Defendant's employees and agents, including the Anaheim Police Department, and those modifications should have been provided.

100.   Defendant is required to "make reasonable modifications in policies, practices, or procedures when such are necessary to avoid discrimination on the basis of disability" where, as here, modifications would not "fundamentally alter the nature of the service, program or activity."  28 C.F.R. § 35.130(b)(7).  This includes the need to make reasonable modifications to protect the essential life-protecting property of persons with disabilities who are homeless, as well as provide prompt and reasonable access to ensure that these individuals are able to recover seized property.  The actions challenged in this lawsuit, even if otherwise facially neutral, unduly burden persons with disabilities such as Plaintiffs who are without shelter and are within the federal definition of the chronically homeless.

101.   Defendant committed the acts and omissions alleged herein with intent and/or reckless disregard for the rights of each of these Plaintiffs.

102.   Plaintiffs are informed and believe that Defendant has failed and continues to fail to adopt and enforce adequate policies and procedures for interacting with homeless individuals with disabilities.

103.   As a result of Defendant's actions and those of its agents and employees, Plaintiffs have suffered injury to their persons and property and are entitled to damages.

## FOURTH CAUSE OF ACTION
### Violation of Civil Rights: State Created Danger
### 42 U.S.C. § 1983 – Fourteenth Amendment

104.   Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth herein.

105.   Under the Due Process Clause of the Fourteenth Amendment, the state deprives a person of a substantive due process right if it affirmatively places the person in a position of danger.  *Wood v. Ostrander*, 875 F.2d 578, 583 (9th Cir. 1989).

106.   Defendant has acted and continues to act affirmatively as described herein to place Plaintiffs and other homeless individuals in a highly dangerous situation that they would not otherwise face, threatening their health and safety and putting their lives at risk.  Plaintiffs are informed and believe that the acts of Defendant and its employees and agents were part of a citywide policy, practice, or custom.

107.   By seizing and destroying essential items, including tents, tarps and blankets, Defendant's actions have created an immediate danger to Plaintiffs' and others' health and safety by exposing them to the elements without adequate shelter or other means to survive.

108.   As a direct and proximate consequence of these unlawful acts, Plaintiffs have suffered and continue to suffer loss of their personal property and physical and emotional distress and are entitled to injunctive relief and compensatory damages for that loss and for injuries to their person.

## FIFTH CAUSE OF ACTION
### Violation of § 504 of the Rehabilitation Act of 1973
### (29 U.S.C. § 794; 29 U.S.C § 794a)

109.   Plaintiffs hereby incorporate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

110.   Section 504 of the Rehabilitation Act of 1973 requires that qualified persons with disabilities be provided with meaningful access to federally funded programs and services.  In order to ensure meaningful access, reasonable modifications may be required unless the recipient of federal funding can demonstrate that such modifications would result in a fundamental alteration in the nature of the program.  29 U.S.C. § 749; 24 C.F.R. §§ 8.3 and 8.4; *Alexander v. Choate*, 469 U.S. 287, 301 (1985).

111.   At all times relevant herein, Defendant has been the recipient of financial assistance from the federal government, including federal ESG monies.

112.   Defendant has used its federal funds in a manner that discriminates against people with disabilities in violation of Section 504 of the Rehabilitation Act, including by denying them meaningful access to the services and amenities that the Defendant offers residents without disabilities and conducting law enforcement and property seizures in a manner that disproportionately burdens people with disabilities.

113.   Defendant's policy, practice, or custom of seizing and destroying essential items utilized by Anaheim's disabled homeless residents constitutes a method of

administration that discriminates against Plaintiffs on the basis of their disabilities. Defendant's actions subjected Plaintiffs to discrimination on the basis of their disabilities in violation of Title II of the ADA by destroying their property and unreasonably preventing Plaintiffs from accessing items necessary to maintain their health and safety.

114.   Plaintiffs' disabilities as well as their need for reasonable modifications of Defendant's policies were obvious and readily apparent to Defendant's employees and agents, including the Anaheim Police Department, and those modifications should have been provided.

115.   As a direct and proximate consequence of these unlawful acts, Plaintiffs have suffered and continue to suffer loss of their personal property and physical and emotional distress and are entitled to injunctive relief and compensatory damages for that loss and for injuries to their person.

**SIXTH CAUSE OF ACTION**
**Violation of Eighth and Fourteenth Amendments (42 U.S.C. § 1983)**
**Art. 7, § 17 California Constitution (Cruel and Unusual Punishment)**

116.   Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth herein.

117.   The acts and omissions of Defendant as described herein violate the constitutional rights of Plaintiffs to be free from threatened or actual cruel and unusual punishment.  By virtue of their status as a homeless person with disabilities and living

unsheltered in a city that lacks sufficient shelter and affordable housing options,

Plaintiffs have no way to comply with the laws Defendant has enforced against them.

118.    The Anaheim Police Department has a policy and practice of citing individuals

who are unsheltered and sleep in public places, or who exhibit other necessary

behaviors that are only conducted in public places because the individual is homeless.

Defendant has repeatedly subjected Plaintiffs and other homeless residents to citations,

arrests, and property seizures, and has charged these individuals with crimes that are

based on their homeless status, such as loitering or being at a public park after hours.

During these enforcement activities, Defendant has seized and destroyed Plaintiffs'

essential property or has made that property inaccessible by taking it to a storage

facility miles away without providing a meaningful opportunity to reclaim the

property.  Defendant's actions have left Plaintiffs even more vulnerable than they

already are because the loss of these essential items increases their exposure to the

various dangers that confront people who live outdoors.

119.    Plaintiffs further allege that it violates their substantive due process rights to

threaten them with citation and arrest for doing nothing more than being present in

Anaheim on public property.  Anaheim has not provided any alternative property on

which Plaintiffs can reside without trespassing or violating Anaheim's "quality of life"

ordinances.  Instead, Anaheim has relentlessly enforced these quality of life

ordinances, pushing Plaintiffs and others similarly situated to move to surrounding

cities or locations outside of Anaheim's jurisdiction. Anaheim's enforcement activities against homeless individuals prevent Plaintiffs from lawfully residing in the city.

120.  As long as there are inadequate shelter options available in Anaheim, Defendant's enforcement activities against Plaintiffs for innocent behavior such as being in a public park after hours violate the Eighth and Fourteenth Amendments of the United States Constitution and Article 7, § 17 of the California Constitution.

121.  Defendant has a custom, policy and practice of encouraging its officers to seize the property of homeless persons and cite them for their unsheltered presence in public places.

122.  There is an actual controversy between Plaintiffs and Defendant concerning the threat of citation and arrest if Plaintiffs remain in Anaheim. Anaheim has not provided an alternative location to permit Plaintiffs to reside in Anaheim without trespassing or violating Anaheim's quality of life ordinances. Instead, Anaheim continues to enforce these quality of life ordinances, preventing Plaintiffs from lawfully residing in the city.

### SEVENTH CAUSE OF ACTION
### California Civil Code § 2080 *et. seq.*

123.  Plaintiffs hereby incorporate all preceding paragraphs as if fully set forth herein.

124.  California Code of Civil Procedure § 2080 *et seq.* imposes a mandatory duty to maintain property that is not abandoned.

125.  Defendant's policies, practices and conduct challenged herein violates California Civil Code § 2080 *et seq.* because Defendant's agents and employees failed to protect

and preserve the personal property of Plaintiffs and others when the property was on public sidewalks and streets or in public spaces, failed to provide adequate notice that the property would be taken, failed to provide receipts for items seized, and failed to provide post-deprivation processes so that Plaintiffs would have a meaningful opportunity to reclaim their property within a reasonable time.

**EIGHTH CAUSE OF ACTION**
**Violation of Civil Rights: Interference By Threat, Intimidation or Coercion**
**California Civil Code § 52.1**

126.   Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth herein.

127.   Defendant's agents and employees have used arrests, threats of arrest and intimidation to interfere with Plaintiffs' rights to maintain their personal possessions in the exercise of Plaintiffs' rights secured by the Constitution of the United States, the Constitution of the State of California, and the statutory laws of the State of California.

128.   Plaintiffs are entitled to an injunction pursuant to California Civil Code §52.1. Plaintiffs are also entitled to damages pursuant to Civil Code §§ 52 and 52.1.  Plaintiffs have filed tort claims with the Defendant.

**NINTH CAUSE OF ACTION**
**Conversion**

129.   Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth herein.

130.   Plaintiffs were in possession of their personal property at the time that Defendant's agents and employees ordered that the property be seized and most, if not all of it, be immediately destroyed without prior notice. Defendant's agents and employees unlawfully prohibited Plaintiffs from securing their personal property.

131.   Defendant, their agents and employees, had a duty to Plaintiffs to protect their personal property.  Plaintiffs' property was not abandoned when Defendant seized it. Defendant breached the duty to protect Plaintiffs' personal property when their agents and employees wrongly exerted dominion over the property and denied Plaintiffs' their constitutional and statutory rights.

132.   Defendant had no legitimate governmental interest that gave their agents and employees the legal right or justification to confiscate Plaintiffs' property and destroy it without prior notice to Plaintiffs and without a procedure to permit Plaintiffs to recover their property, and without fair compensation to Plaintiffs.

133.   As a direct and proximate consequence of these unlawful acts, Plaintiffs have suffered and continue to suffer loss of their personal property and physical and emotional distress and are entitled to injunctive relief and compensatory damages for that loss and for injuries to their person.

## **INJUNCTIVE RELIEF**

134.   Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth herein.

135.   A real and immediate difference exists between Plaintiffs and Defendant regarding Plaintiffs' rights and regarding the duties owed by Defendant to Plaintiffs to protect Plaintiffs' personal property located in public spaces.  Defendant's policies and actions have resulted, and will result, in irreparable injury to Plaintiffs.  There is no plain, adequate or complete remedy at law to address the wrongs described herein. Defendant has made clear by its unlawful seizures and destruction of the personal property of unhoused individuals that it intends to continue its practice of seizing (and often destroying) the property of homeless persons without a warrant, without adequate notice, and without providing a meaningful opportunity to be heard regarding such seizures and destruction.  Defendant has also made clear that it intends to continue the storage practices described above which make it very difficult for homeless persons to reclaim their property that is not destroyed.  Unless restrained by this Court, Defendant will continue these unlawful policies and practices.

136.   Defendant's acts alleged above violate established constitutional rights of Plaintiffs, and Defendant could not reasonably believe that the conduct of its agents and employees in seizing (and often destroying) Plaintiffs' property was lawful.

137.   An actual controversy exists between Plaintiffs and Defendant in that Defendant and its agents and employees have engaged in the unlawful and unconstitutional acts alleged herein and intend to continue to do so.  Plaintiffs claim that these acts are contrary to law and seek a declaration of their rights with regard to this controversy.

138.   As a direct and proximate consequence of the acts of Defendant's agents and employees, Plaintiffs have suffered, and will continue to suffer, injury to their person and suffer loss of their personal property, including their bedding, tents, clothing and other personal possessions, stripping them of essential items needed for their well-being and personal dignity and placing them at serious and immediate risk of illness from living in the elements without protection.

## JURY DEMAND

139.   Plaintiffs demand a jury trial on all triable issues.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray as follows:

140.   For a declaratory judgment that Defendant's policies, practices and conduct as alleged herein violate Plaintiffs' rights under the United States and California constitutions and the laws of the United States and the State of California;

141.   For a temporary restraining order, preliminary and permanent injunction, enjoining and restraining Defendant from engaging in the policies, practices and conduct complained of herein;

142.   For an order directing Defendant to provide homeless individuals whose property is seized with notice and an itemized receipt that identifies the seized personal property, a reasonable and accessible location of where the property is stored, and how the property may be retrieved;

143.   For an order directing Defendant to segregate by owner and inventory all personal property seized by Defendant at storage facilities within half a mile of the locations of the seizures, and to provide access to the stored property during normal business hours on a daily basis;

144.   For an order directing Defendant to provide replacement blankets, tents, tarps, medications, clothing, personal identifications, EBT cards, and other documents to anyone whose property is seized for whatever reason, including purported public health and safety grounds;

145.   For damages in an amount to be determined according to proof;

146.   For costs of suit and attorney fees as provided by law;

147.   For such other relief as the Court deems just and proper.


Dated:        April 18, 2018



                                    Respectfully submitted,


                                    LEGAL AID SOCIETY OF ORANGE
                                    COUNTY



                                    ___/s/ Sarah J. Gregory_____
                                    By: Sarah J. Gregory